IN THE DISTRICT COURT

FOR THE TERRITORY OF GUAM

| | |
|---|---|
| THOMAS PEINHOPF,<br><br>    Plaintiff,<br><br>vs.<br><br>LOURDES LEON GUERRERO, in her official capacity as Governor of Guam and in her personal capacity, and<br>ARTHUR SAN AGUSTIN[], in his official capacity as Director of DPHSS and in his personal capacity,<br><br>    Defendants. | CIVIL CASE NO. 20-00029<br><br>**REPORT & RECOMMENDATION**<br>to Grant Motion to Dismiss<br>(ECF No. 10) With Leave to Amend |

This action involves a Guam resident and business owner who asserts that the Defendants' emergency orders and memos regarding COVID-19[1] violated his constitutional rights. The Defendants filed a Motion to Dismiss, *see* ECF No. 10, seeking to dismiss the Complaint for failure to state a claim upon which relief can be granted. On December 8, 2020, the court heard argument on the motion. *See* Minutes, ECF No. 20. Having reviewed the parties' filings and relevant case law, the court now issues this Report and Recommendation for the Chief Judge to grant the Motion to Dismiss with leave to amend as to Counts I through IV and to dismiss with prejudice the Plaintiff's request for monetary damages against the Defendants in their official capacities.

---

[1] The Plaintiff refers to the various executive orders and emergency memos as the "Business Shutdown Orders." Compl. At ¶15, ECF No. 1.

# BACKGROUND

On March 14, 2020, Governor Lourdes A. Leon Guerrero issued Executive Order 2020-03, declaring a "state of emergency" to "protect[] against the spread of COVID-19." Exec. Order No. 2020-03 (attached as Ex. A to Compl., ECF No. 1). This executive order followed the declaration of the World Health Organization ("WHO") of a "Global Health Emergency with regard to the COVID-19 outbreak" on January 30, 2020, and the United States Health and Human Services Secretary's January 31, 2020 declaration of a "public health emergency for the United States to aid the nation's healthcare community in responding to COVID-19." *Id.*

On March 19, 2020, Governor Leon Guerrero issued Executive Order 2020-05. *See* Ex. B to Compl., ECF No. 1. Under the terms of the executive order, the Governor ordered that "any place of business or public accommodation shall close and be prohibited from on-site operations" effective 12 noon on March 20, 2020 through March 30, 2020. *Id.* The executive order then listed various categories of businesses to whom the prohibition of operations did not apply. *Id.* These included grocery stores, health care supply stores, gas stations, banks, hardware stores and laundromats. *Id.*

On May 8, 2020, Governor Leon Guerrero signed Executive Order 2020-14, moving Guam from Pandemic Condition of Readiness ("PCOR") 1 to PCOR 2 effective May 10, 2020. *See* Ex. C to Compl., ECF No. 1. "All businesses that were allowed to operate during PCOR 1[were permitted to] continue to operate" *Id.* at ¶2.b. The Governor further ordered that other businesses were allowed to operate as limited in Guidance Memo 202-07, issued by the Department of Public Health and Social Services ("DPHSS"). *Id.* These businesses included real estate and automotive sales, cosmetic establishments, flower shops and shopping malls. *See* DPHSS Guidance Memo 2020-07 at ¶2, Ex. E to Compl., ECF No. 1.

On July 19, 2020, Governor Leon Guerrero signed Executive Order 2020-24, placing Guam in PCOR 3 effective July 20, 2020. *See* Ex. F to Compl., ECF No. 1. "Except for such businesses and activities specifically prohibited under applicable DPHSS Guidance, [the Governor permitted] all businesses and activities . . . to operate under . . . occupancy limitations" set forth in the executive order. *Id.* at ¶2.b.

On August 7, 2020, Governor Leon Guerrero issued Executive Order 2020-26, temporarily closing bars and taverns effective August 8, 2020 until August 22, 2020. *See* Exec. Order 2020-26 at ¶1.a.i., Ex. G to Compl. ECF No. 1.

"Then as a consequence of spreading contagion, on August 14, 2020, [Governor] Leon Guerrero issued Executive Order 2020-27, which again closed all businesses except those listed in applicable [DPHSS] guidance." Compl. at ¶18, ECF No. 1 and Ex. H thereto.

On September 22, 2020, the Plaintiff, who operated a bar or tavern business as Livehouse Inc. and Livehouse Inc., dba The Shady Lady, *id.* at ¶¶7 and 27, filed the instant action against Governor Leon Guerrero and the Director of DPHSS in their official and personal capacities. The Complaint asserted the Defendants violated the Plaintiff's constitutional rights, and the Plaintiff requested declaratory and injunctive relief, as well as monetary damages.

In lieu of an answer, the Defendants filed a Motion to Dismiss on October 13, 2020. *See* ECF No. 10.

On November 24, 2020, the Chief Judge referred the motion to the below-signed Magistrate Judge for the issuance of a report and recommendation as to the appropriate disposition. *See* Order re Referral, ECF No. 15.

## LEGAL STANDARD FOR RULE 12(B)(6) MOTIONS

Federal Rule of Civil Procedure 12(b)(6) permits the dismissal of a claim for "failure to state a claim upon which relief can be granted[.]" Review of a Rule 12(b)(6) motion is generally limited to the contents of the complaint and its attachments. *Lee v. County of Los Angeles*, 250 F.3d 668, 688 (9th Cir. 2001). On a Rule 12(b)(6) motion to dismiss, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *Fed'n of African Am. Contractors v. City of Oakland*, 96 F.3d 1204, 1207 (9th Cir.1996). A court is not required to accept as true legal conclusions couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the

misconduct alleged." *Iqbal*, 556 U.S. at 678.

## DISCUSSION

1. <u>Applicability of *Jacobson*</u>

At the onset, the first issue to address is what legal standard should apply. The parties' briefs discuss at length the case of *Jacobson v. Massachusetts*, 197 U.S. 11 (1905). *Jacobson* involved a constitutional challenge to a state law and a rule promulgated by the board of health of Cambridge, Massachusetts, which required inhabitants of the city to be vaccinated against smallpox. *Id.* at 12-13. The appellant refused to be vaccinated, and a criminal complaint was filed against him. *Id.* at 13. He was subsequently convicted and ordered to pay a $5 fine. *Id.* at 14. The court ordered that he stand committed until the fine was paid. *Id.* On appeal, the Supreme Court addressed whether the statute was "inconsistent with the liberty which the Constitution of the United States secures to every person against deprivation by the state,[.]" *Id.* at 24. The Supreme Court affirmed the conviction and reasoned that to hold in favor of the appellant "would practically strip the legislative department of its function to care for the public health and the public safety when endangered by epidemics of disease." *Id.* at 37.

Under the *Jacobson* framework, judicial review of constitutional challenges to state emergency measures taken during a public health crisis is narrow:

> If there is any such power in the judiciary to review legislative action in respect of a matter affecting the general welfare, it can only be when that which the legislature has done comes within the rule that, if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety, has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law, it is the duty of the courts to so adjudge, and thereby give effect to the Constitution.

*Id.* at 31. The *Jacobson* Court emphasized that the manner in which the state decides to combat an epidemic is entitled to deference. *See id.* at 30 ("It is no part of the function of a court or a jury to determine which one of two modes was likely to be the most effective for the protection of the public against disease.").

Recently, many federal courts have relied on *Jacobson* in constitutional challenges to state and local orders issued to curb the spread of the COVID-19 virus. Plaintiff, however, argues that courts are "moving away from abject deference" as announced in *Jacobson*. Pl.'s Opp'n at 9, ECF

No. 11. Even the Supreme Court's *per curiam* decision in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 532 U.S. ___ (2020), did not apply or analyze the *Jacobson* standard in a challenge to New York governor's executive order imposing occupancy restrictions to houses of worship during the pandemic. Justice Gorsuch recognized in his concurrence that "*Jacobson* pre-dated the modern tiers of scrutiny" and argued that the appropriate standards of review developed post-*Jacobson* should apply since "[g]overnment is not free to disregard the First Amendment in times of crisis."

Because the *Jacobson* framework has been called into question and because the Motion to Dismiss analyzes the claims under *post-Jacobson* tiered standards, the court does not put much reliance on the holding of said case and will instead apply the current applicable standards of review to the challenged actions.

2. <u>Count 1 - Fifth Amendment Takings Claim</u>

Count 1 of the Complaint asserts that the Governor's Business Shutdown Orders took property from the Plaintiff without just compensation. Compl. at ¶39, ECF No. 1. The Plaintiff alleges that the Business Shutdown Orders "worked to prohibit the use of [his] property and . . . caused a seizure and diminution or loss in value of that property" *id.* at ¶40, because "[p]roperty and business owners who were forced to close their businesses suffered a taking and were, therefore, obligated to bear the cost of government action without just compensation." *Id.* at ¶42. The Defendants argue that this claim fails to state a Fifth Amendment takings claim.

   *A.*     *Relevant Law*

The Takings Clause of the Fifth Amendment, made applicable to Guam through the Organic Act at 48 U.S.C. § 1421(b)(u), prohibits the taking of private property "for public use without just compensation." U.S. CONST. amend. V. The Supreme Court has instructed that the Takings Clause "is designed not to limit the governmental interference with property rights *per se*, but rather to secure compensation in the event of otherwise proper interference amounting to a taking." *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005) (quoting *First English Evangelical Lutheran Church of Glendale v. County of Los Angeles,* 482 U.S. 304, 314 (1987)).

A takings challenge involves a two-step inquiry. First the court "must determine whether a 'taking' has occurred; that is, whether the complained-of government action constitutes a 'taking,'

thus triggering the requirements of the Fifth Amendment. If so, [the court] move[s] to the second step and ask[s] if the government provided just compensation to the former property owner." *Horne v. U.S. Dep't of Agric.*, 750 F.3d 1128, 1136 (9th Cir. 2014), *rev'd sub nom. Horne v. Dep't of Agric.*, 576 U.S. 350 (2015).

The Supreme Court has generally recognized two types of takings. The first is the "paradigmatic taking" – often referred to as a "physical taking" or "classic taking" – where the government directly appropriates or physically invades private property. *Lingle*, 544 U.S. at 537. "When the government physically takes possession of an interest in property for some public purpose, it has a categorical duty to compensate the former owner regardless of whether the interest that is taken constitutes an entire parcel or merely a part thereof." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002) (internal citation omitted).[2]

The second type of taking is where government regulation of private property may "be so onerous that its effect is tantamount to a direct appropriation or ouster." *Lingle*, 544 U.S. at 537. Supreme Court precedents recognize two narrow categories of regulatory action that are generally deemed "*per se* takings for Fifth Amendment purposes." *Id.* at 538.

///

---

[2] The Supreme Court provided the following examples as classic takings:

> Thus, compensation is mandated when a leasehold is taken and the government occupies the property for its own purposes, even though that use is temporary. *United States v. General Motors Corp.*, 323 U.S. 373 (1945); *United States v. Petty Motor Co.*, 327 U.S. 372 (1946). Similarly, when the government appropriates part of a rooftop in order to provide cable TV access for apartment tenants, *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982); or when its planes use private airspace to approach a government airport, *United States v. Causby*, 328 U.S. 256 (1946), it is required to pay for that share no matter how small. But a government regulation that merely prohibits landlords from evicting tenants unwilling to pay a higher rent, *Block v. Hirsh*, 256 U.S. 135 (1921); that bans certain private uses of a portion of an owner's property, *Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365 (1926); *Keystone Bituminous Coal Assn. v. DeBenedictis*, 480 U.S. 470 (1987); or that forbids the private use of certain airspace, *Penn Central Transp. Co. v. New York City*, 438 U.S. 104 (1978), does not constitute a categorical taking.

*Tahoe-Sierra*, 535 U.S. at 322-23 (parallel citations omitted).

Thomas Peinhopf v. Lourdes Leon Guerrero and Arthur San Agustin, in their official and personal capacities, Civil Case No. 20-00029
Report and Recommendation re Motion to Dismiss
page 7 of 18

> First, where government requires an owner to suffer a permanent physical invasion of her property – however minor – it must provide just compensation. *See Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) (state law requiring landlords to permit cable companies to install cable facilities in apartment buildings effected a taking). A second categorical rule applies to regulations that completely deprive an owner of "*all* economically beneficial us[e]" of her property. *Lucas [v. South Carolina Coastal Council]*, 505 U.S. [1003,] 1019 [(1992)] (emphasis in original).

*Id.*

If the challenged government regulation does not fall into either of these two categories constituting regulatory *per se* takings, the court must apply the balancing factor test set forth in *Penn Central*. Under the *Penn Central* test, the court considers the following three factors: "[1] the regulation's economic impact on the claimant, [2] the extent to which the regulation interferes with distinct investment-backed expectations, and [3] the character of the government action." *MHC Fin. Ltd. P'ship v. City of San Rafael*, 714 F.3d 1118, 1127 (9th Cir. 2013). "Judicial decisions considering regulatory takings claims are typically 'characterized by essentially ad hoc, factual inquiries, designed to allow careful examination and weighing of all the relevant circumstances.'" *Colony Cove Props., LLC v. City of Carson*, 888 F.3d 445, 450 (9th Cir. 2018) (*quoting Tahoe-Sierra*, 535 U.S. at 322). Government action must impose a severe enough burden on private property rights such that the regulation is "functionally equivalent to the classic taking in which government directly appropriates private property or ousts the owner from his domain." *Lingle*, 544 U.S. at 539.

        B.        Takings Analysis

Here, the Plaintiff's Complaint does not allege that a "paradigmatic taking" occurred. The government did not appropriate or occupy the Plaintiff's private property, and the Plaintiff has not argued that he suffered this sort of physical taking.

Thus, the court must analyze the regulatory takings cases to determine whether the Governor's executive orders and the Guidance Memos issued by DPHSS amount to a "regulatory taking" that is compensable. Here, the Complaint does not allege that the government action complained of caused the Plaintiff to suffer a permanent physical invasion of his property, nor does the Complaint assert that the government action completely deprived him of *all* economically

beneficial use of his property. Instead, the Complaint asserts that the Business Shutdown Orders "forced [him] to close [his] business[]and caused a "diminution or loss in value of that property." Compl. at ¶¶39 and 42. Because the Plaintiff has not alleged that the government action constitutes a regulatory *per se* taking, the court must evaluate the Plaintiff's claim under the *Penn Central* framework.

It would appear at first glance that the first *Penn Central* factor – the economic impact of the regulation on the claimant – favors the Plaintiff, however, while not addressed by the parties, the Complaint does not indicate the economic impact that the Defendants' actions have had on the Plaintiff except in vague and conclusory terms. As noted above, the Complaint merely states that the Plaintiff was forced to close his business, causing a diminution or loss in the value of his property. Compl. at ¶40, ECF No. 1. The Complaint also asserts that Defendants' orders "threaten the future viability and sustainability of [his] business." *Id.* at ¶32. There is no factual assertion as to the magnitude or value of the Plaintiff's loss. The Complaint simply lacks any specificity regarding financial harm.

Additionally, case law discussing regulatory takings usually involves "government conduct that denies beneficial use of *property*, meaning things like legal interest in real or personal property, not the liberty interest to engage in a business activity." *Savage v Mills*, No. 1:20-CV-00165-LEW, 2020 WL 4572314, *9 (D. Me. Aug. 7, 2020) (emphasis added).[3] *See also Antietam Battlefield KOA v. Hogan*, No. CCB-10-1130, 2020 WL 6777590 (D. Md. Nov. 18, 2020) (*citing Coll. Sav. Bank v. Florida Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675 (1999) ("The assets of a business . . . unquestionably are property, and any state taking of those assets is unquestionably a 'deprivation' under the Fourteenth Amendment. But business in the sense of the activity of doing business, or the activity of making a profit is not property in the ordinary sense[.]"). *See also United States v. Gen. Motors Corp.*, 323 U.S. 373, 380 (1945) ("it has generally been held that that which is taken or damaged is the group of rights which the so-called owner exercises in his dominion of

---

[3] In *Savage*, Maine residents, individually and on behalf of their limited liability companies, brought suit against the Maine governor, asserting that their businesses were adversely impacted by the governor's executive orders related to the pandemic.

the physical thing, and that damage to those rights of ownership does not include losses to his business or other consequential damage").

Here, the Complaint does not allege that the Plaintiff owns the property at which he does business. The Complaint asserts that the Plaintiff does business at 301 Villa San Vitores, Happy Landing Rd., Tumon, Guam, but it does not assert that the Plaintiff actually owns the physical property. *See* Compl. at ¶7, ECF No. 1. Instead, the Plaintiff's takings claim alleges that the government conduct frustrated his ability to engage in his business enterprise. While the Plaintiff was not able to operate his business for a time, Plaintiff has failed to cite any authority recognizing that the temporary inability to sell goods or services, as a matter of law, constitutes a taking of property under the Fifth Amendment.[4]

The Defendants argue that even if the court accepted as true that there was a diminution in value to the Plaintiff's property, this is insufficient to demonstrate a taking. *See* Mot. Dismiss at 13, ECF No. 10.

> Supreme Court precedent has "long established that mere diminution in the value of property, however serious, is insufficient to demonstrate a taking." *Concrete Pipe & Prods. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 645 (1993) (*citing Village of Euclid v. Ambler Realty Co.*, 272 U.S. 365, 384 (1926) (approximately 75% diminution in value); *Hadacheck v. Sebastian*, 239 U.S. 394, 405 (1915) (92.5% diminution)); *see also William C. Haas & Co., Inc. v. City & Cnty. of S.F.*, 605 F.2d 1117, 1120 (9th Cir. 1979) (finding no taking where "the value of its property was reduced from about $2,000,000 to about $100,000").

*MHC Fin. Ltd. P'ship*, 714 F.3d at 1127-28 (parallel citations omitted).

The economic impact of the government's action appears to have only prevented the Plaintiff from operating his bar or tavern, but the Complaint does not allege that the Plaintiff is unable to

---

[4] The "right to operate his business" as described in paragraph 27 of the Complaint is separate and apart from the alleged substantive due process "right to pursue lawful employment and livelihood as [he] shall determine and conduct lawful business as [he] shall determine and be free of governmental interference." Compl. at ¶55, ECF No. 1. The Plaintiff's Opposition at page 11 cites to the concurring opinion of a Supreme Court case stating that "[w]e recognized in *Greene v. McElroy*, 360 U.S. [474], [] 492 [(1959)], that 'the right to hold specific private employment and to follow a chosen profession free from unreasonable governmental interference comes within the 'liberty' and 'property' concepts of the Fifth Amendment.'" *United States v. Robel*, 389 U.S. 258, 265 (1967) (parallel citation omitted).

operate any other type of business on the premises. The government action only interferes with a "single strand" of the property rights he possess in his leasehold interest. *See Colony Cove*, 888 F.3d at 450 (if "an owner possesses a full 'bundle' of property rights, the destruction of one 'strand' of the bundle is not a taking, because the aggregate must be viewed in its entirety") (internal quotations omitted). Like many other businesses throughout the island, the Plaintiff's bar business suffered, but his leasehold interest and the actual property at which the business operated still retained value. There simply is no basis on the record before it for the court to conclude that the Plaintiff has satisfied the first *Penn Central* factor.

Turning to the second factor, the court must examine the extent to which the regulation interferes with the Plaintiff's distinct investment-backed expectations. Here, the Plaintiff asserts that he "has invested a tremendous amount of financial resources, time and effort into all aspects of his business." Although no monetary value is specified, the Complaint alleges that the Plaintiff's investments included "the purchase or lease of equipment, inventory and physical business facilities; advertising; training and hiring of employees; and customer development, as well as other expenses such as rent or mortgage payments." Compl. at ¶30, ECF No. 1.

The Defendants' Motion to Dismiss argues that "'[t]o form the basis for a taking claim, a purported distinct investment-backed expectation must be objectively reasonable.'" Mot. Dismiss at 13, ECF No. 10 (quoting *Colony Cove*, 888 F.3d at 452). The Defendants assert that the Governor's temporary measures to contain the pandemic are not "subservient to [the Plaintiff's] individual right to earn a profit by running a bar or tavern." *Id*. The court believes this argument by the Defendants is better addressed in the third *Penn Central* factor (evaluating the character of the government action). At the pleading stage, the Complaint's allegations at ¶30 suffice to establish and the court can reasonably assume that the Defendants' actions have interfered with the Plaintiff's distinct investment-backed expectations with regard to the operation of the Shady Lady bar. Thus, this second factor weighs in favor of allowing the Plaintiff's takings claim to proceed.

The third and final *Penn Central* factor – the character of the governmental action – decisively weighs against the Plaintiff. As the Defendants' motion notes and the exhibits to Complaint demonstrate, consistent with the actions of the Centers for Disease Control, WHO and

President Trump, the Governor declared a state of public health emergency in response to the COVID-19 outbreak, and executive orders and guidance memos were issued "to safeguard the community and general welfare of the island" from the further spread of the pandemic. In an effort to keep the island's residents safe during this deadly pandemic, the Defendants took the actions they did to address the current public health emergency. These government directives were aimed at flattening the curve, slowing the spread of COVID-19 and preventing the health care system from becoming overwhelmed. The character of the governmental action here tips strongly in the Defendants' favor.

Additionally,

> [c]ourts have long recognized that regulations that protect public health or prevent the spread of disease are not of such a character as to work a taking. In *Miller v. Schoene*, the Supreme Court considered whether diminution of value caused by state mandated destruction of property owners' red cedar trees to prevent the spread of cedar rust, a fungal disease, to neighboring apple orchards must be compensated as a taking. 276 U.S. 272, 277-79 (1928). The Court declined to order plaintiffs be compensated, concluding that "where the public interest is involved preferment of that interest over the property interest of the individual, to the extent even of its destruction, is one of the distinguishing characteristics of every exercise of the police power which affects property." [*Id.*] at 279-80. In *Rose Acre Farms, Inc. v. United States*, the United States Court of Appeals for the Federal Circuit considered whether regulations restricting the interstate sale and transportation of eggs and poultry from flocks contaminated by salmonella was a compensable taking. 559 F.3d 1260, 1263 (Fed. Cir. 2009). There, the court concluded that "the character of the government's act, protecting the public health by identifying diseased eggs and forcing their owner to remove them from the table market, weighs strongly against finding a taking here." *Id.* at 1281.

*Blackburn v. Dare Cty.*, No. 2:20-CV-27-FL, 2020 WL 5535530, at *6 (E.D.N.C. Sept. 15, 2020).

In sum, two of the three *Penn Central* factors favor the Defendants. Despite the interference with Plaintiff's investment-backed expectations, the Plaintiff fails to adequately plead his economic impact resulting from the Defendants' actions, and the character of the governmental action would appear to favor dismissal. The Plaintiff has failed to state a plausible claim for relief under the Fifth Amendment, and the court recommends that Count 1 be dismissed.

///
///
///
///

3. <u>Count II - Substantive Due Process Claim</u>[5]

Count II of the Complaint asserts a substantive due process claim under the Fourth Amendment because (i) the Governor failed to establish a waiver process through which businesses could apply to be excluded from her non-essential businesses determination nor an appeal process for such decision, (ii) the Defendants did not set forth with particularity what factors were considered in determining whether a business is essential, and (iii) the Defendants' classification of what businesses are essential is arbitrary and capricious. Compl. at ¶¶47-49.

*A. Relevant Law*

"The Due Process Clause of the Fourteenth Amendment includes a substantive component that protects certain individual liberties from state interference." *Franceschi v. Yee*, 887 F.3d 927, 937 (9th Cir.) (internal quotation marks omitted), *cert. denied*,___ U.S. ___, 139 S. Ct. 648 (2018). But "[t]he range of liberty interests that substantive due process protects is narrow and [o]nly those aspects of liberty that we as a society traditionally have protected as fundamental are included within the substantive protection of the Due Process Clause." *Id.* (second alteration in original) (internal quotation marks omitted). "Substantive due process has, therefore, been largely confined to protecting fundamental liberty interests, such as marriage, procreation, contraception, family relationships, child rearing, education and a person's bodily integrity, which are 'deeply rooted in this Nation's history and tradition.' " *Id.* (*quoting Moore v. City of E. Cleveland*, 431 U.S. 494, 503 (1977); then *citing Planned Parenthood of Se. Pennsylvania v. Casey*, 505 U.S. 833, 851 (1992)).

*B. Substantive Due Process Analysis*

The Plaintiff asserts a number of rights allegedly infringed by the Defendants. According

---

[5] The Defendants' Motion to Dismiss argues that courts are reluctant to expand the concept of substantive due process and where "a constitutional claim is covered by a specific constitutional provision. . . . the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." Mot. Dismiss at 15, ECF No. 10 (*quoting Altman v. County of Santa Clara,* No. 20-cv-02180-JST, 2020 WL 2850291, *18 (N.D. Cal. June 2, 2020). The Defendants assert that a substantive due process analysis is "precluded" since the Plaintiff's constitutional claims are best addressed under the standards applicable to the Fifth Amendment, equal protection and procedural due process. *Id.* Despite such a claim, the Motion to Dismiss then proceeds with a substantive due process analysis. Accordingly, the court will proceed with analyzing the Plaintiff's substantive due process claim for purposes of this Report and Recommendation.

to the Complaint, Plaintiff has "the right to pursue lawful employment and livelihood as [he] shall determine and conduct lawful business as [he] shall determine and be free of governmental interference." Compl. at ¶55, ECF No. 1. The Complaint further asserts

> All fundamental rights comprised within the term liberty, including, but not limited to, the rights to be free from bodily restraint, the right to contract and engage in the common occupations of life, the right to acquire useful knowledge, to worship God according to the dictates of one's own conscience, and to generally enjoy the privileges long associated with the rights of free people are guaranteed substantive due process rights under the Fourteenth amendment. The shutdown is causing citizens of Guam to lose their jobs, their livelihoods, and their reputations in their communities.

*Id.* at ¶¶56-57.

While these fundamental rights exist and are protected, the sum of the Plaintiff's allegations reveals that the essence of his substantive due process claim is that he is being deprived of a right to earn a living as he so chooses. The Supreme Court

> has indicated that the liberty component of the Fourteenth Amendment's Due Process Clause includes some generalized due process right to choose one's field of private employment, but a right which is nevertheless subject to reasonable government regulation. *See, e.g., Dent v. West Virginia*, 129 U.S. 114 (1889) (upholding a requirement of licensing before a person can practice medicine); *Truax v. Raich*, 239 U.S. 33 (1915) (invalidating on equal protection grounds a state law requiring companies to employ 80% United States citizens). These cases all deal with a complete prohibition of the right to engage in a calling, and not the sort of brief interruption which occurred here.

*Conn v. Gabbert*, 526 U.S. 286, 291-92 (1999) (parallel citations omitted).

In the Motion to Dismiss, Defendants also argue that only official conduct that "shocks the conscience" is cognizable as a substantive due process violation and that the Complaint must allege facts from which to plausibly infer the Defendants "acted with deliberate indifference" or "acted with the purpose to harm." Mot. Dismiss at 16-17, ECF No. 10. While the Complaint does assert that "Defendants' actions shock the conscience of the citizens of this Territory," Compl. at ¶54, ECF No. 1, this is simply a conclusory statement with no factual allegations to support such a claim. The Complaint also does not contain any factual allegations showing that the Defendants acted with deliberate indifference or with the purpose to harm. Instead, the exhibits attached to the Complaint indicate that the Defendants' actions were taken to safeguard public health and contain the virus's spread. Accordingly, the court recommends the dismissal of Count II since the conclusory

allegations of the Complaint are insufficient to state a plausible violation of his substantive due process rights.

### 4. Count III - Procedural Due Process Claim

Count III of the Complaint asserts that the Plaintiff has not been afforded the following due process protections:

> a. the determinations of non-essentialness are written and do not permit evaluation by a neutral arbitrator; b. the determinations of non-essentialness do not provide for an opportunity to be heard; c. the determinations of non-essentialness do not offer an opportunity to present witnesses; d. the determinations of non-essentialness do not permit an opportunity to cross examine witnesses; e. the determinations of non-essentialness do not provide for a reasoned decision; and f. the determinations of non-essentialness do not provide for an opportunity for an appeal.

Compl. at ¶60, ECF No. 1. Additionally, the Plaintiff complains that the "Governor did not permit citizens of Guam to request an exemption to the closure orders." *Id.* at ¶61.

#### A. Relevant Law

Under Ninth Circuit case law, a 42 U.S. Code § 1983 claim alleging a procedural due process denial requires proof of three elements: (1) a deprivation of a constitutionally protected liberty interest; (2) a state action; and (3) constitutionally inadequate process. *See Thornton v. City of St. Helens*, 425 F.3d 1158, 1164 (9th Cir. 2005) (§ 1983 claim requires state action and procedural due process violation requires "(1) a protectible liberty or property interest . . . and (2) a denial of adequate procedural protections").

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). These protections notwithstanding, the Supreme Court has determined that "summary administrative action may be justified in emergency situations." *Hodel v. Va. Surface Mining & Reclamation Ass'n, Inc.*, 452 U.S. 264, 300 (1981) (citations omitted). A "deprivation of property to protect the public health and safety is '[o]ne of the oldest examples' of permissible summary action." *Id.* (alteration in original) (citations omitted).

#### B. Procedural Due Process Analysis

In this case, and as discussed above, the Plaintiff has failed to assert a protectible liberty or

property interest. Even if the court assumed that the Plaintiff has asserted a constitutionally protected right, there is no dispute that the COVID-19 pandemic is an unprecedented emergency. It would appear that this is precisely the type of emergency situation that required "summary administrative action" since the measures taken were designed to protect the public from the pandemic. The conclusory allegations of the Complaint do not "give rise to the constitutional procedural due process requirements of individual notice and hearing; general notice as provided by law is sufficient." *Halverson v. Skagit County*, 42 F.3d 1257, 1261 (9th Cir. 1994). Accordingly, the court recommends that the Chief Judge dismiss Count III of the Complaint since it fails to allege a plausible procedural due process claim.

### 5. Count IV - Equal Protection Claim

The fourth and final claim in the Complaint asserts the Defendants violated the equal protection clause because the system of classifying businesses as either essential or non-essential is "arbitrary and irrational" and "will cause [the] Plaintiff to be completely deprived of the use and control of his private property while other businesses will be authorized to operate." Compl. at ¶¶ 66 & 70, ECF No. 1.

#### A. Relevant Law

"The Equal Protection Clause of the Fourteenth Amendment commands that no state shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (*quoting Plyler v. Doe*, 457 U.S. 202, 216 (1982)). The Supreme Court has "repeatedly held that 'a classification neither involving fundamental rights nor proceeding along suspect lines . . . cannot run afoul of the Equal Protection Clause if there is a rational relationship between disparity of treatment and some legitimate governmental purpose.'" *Cent. State Univ. v. Am. Ass'n of Univ. Professors*, 526 U.S. 124, 127-28 (1999) (alteration in original) (citations omitted); *Nat'l Ass'n for the Advancement of Psychoanalysis v. Cal. Bd. of Psychology*, 228 F.3d 1043, 1049 (9th Cir. 2000) ("To withstand Fourteenth Amendment scrutiny, a statute is required to bear only a rational relationship to a legitimate state interest, unless it makes a suspect classification or implicates a fundamental right." (citations omitted)).

Thomas Peinhopf v. Lourdes Leon Guerrero and Arthur San Agustin, in their official and personal capacities, Civil Case No. 20-00029
Report and Recommendation re Motion to Dismiss
page 16 of 18

### B. Equal Protection Analysis

While the Plaintiff asserts businesses are being treated differently based on the Defendants' actions in classifying businesses into "essential and "non-essential" categories, *see* Compl. at ¶66, ECF No. 1, the classification here does not involve a suspect class, and the Plaintiff has not shown that the classification involves a fundamental right, such as the free exercise of religion, speech or the right to vote. Despite the Plaintiff's allegations to the contrary, a review of the factual allegations in the Complaint and exhibits thereto do not establish that the Plaintiff's establishment is similarly situated to businesses such as Payless Supermarkets and K-Mart, which sell essential grocery items, or even to Home Depot, which carries cleaning supplies and other items necessary for home repair. Neither has the Plaintiff shown that the classifications at issue here were drawn on any basis other than the risk posed to the public health. Rather, the exhibits to the Complaint appear to demonstrate that the Defendants' enacted measures were rationally based on a legitimate public health interest. Accordingly, Count IV as presented in the Complaint should be dismissed since the Plaintiff has failed to plead a plausible claim under the Equal Protection Clause.

### 6. Whether Claims for Damages Should be Dismissed

Finally, in addition to declaratory and injunctive relief, the Complaint seeks "compensation . . . for the unlawful taking visited upon [him]" and the "award of costs and expenses, including reasonable attorneys' fees under 42 U.S.C. § 1983 and 1988[.]" Compl. at 12, ECF No. 1. The Defendants' Motion to Dismiss argues that the claims for damages should be dismissed since (1) case law is clear that the Defendants can not be sued for damages in their official capacities because "neither the Territory of Guam nor its officers acting in their official capacities are "persons" under § 1983, *Ngiraingas v. Sanchez*, 495 U.S. 182, 192 (1990); and (2) the Defendants are entitled to qualified immunity, which purportedly prevents claims against the Defendants in their personal capacities. Mot. Dismiss at 10-11 and 23-25.

The Plaintiff's Opposition fails to respond to any of these arguments, and the Defendants contend that such silence should be construed as a concession. Defs.' Reply at 2-3, ECF No. 12. While the Plaintiff's failure to counter the Defendants' argument can be taken as a concession, the court will opt to discuss the matters further.

In *Ngiraingas,* the Supreme Court held that "neither the Territory of Guam nor its officers acting in their official capacities are 'persons" under § 1983." 495 U.S. 192. Despite the *Ngiraingas* holding, the Ninth Circuit in *Guam Society of Obstetricians & Gynaecologists v. Ada* held that a Guam officer sued in his official capacity is a "person" within the meaning of § 1983 when sued for prospective relief. 962 F.2d 1366, 1370 (9th Cir. 1992). The Ninth Circuit reaffirmed this holding in *Paeste v. Government of Guam*, 798 F.3d 1228, 1237 (9th Cir. 2015). The Ninth Circuit distinguished Ngiraingas by noting that the plaintiffs in that case were suing Guam and several Guam officials in their official capacities for damages. In *Ada* and *Paeste*, however, the plaintiffs were seeking prospective injunctive relief. Here, the Plaintiff seeks declaratory and injunctive relief, in addition to monetary damages. The court concurs with the Defendants that the claims for money damages against the Defendants in their official capacities are barred.

With regard to the qualified immunity defense, the court notes that qualified immunity shields a government official from civil liability unless a plaintiff can show that (1) the official violated a constitutional right and (2) that right was "clearly established" at the time of the challenged conduct, such that "every reasonable official" would have understood that what she was doing violates that right. *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citation and internal quotation mark omitted). With regard to the Defendants' assertion that they are also entitled to qualified immunity, the court declines to address this defense at this time since the court has found that the Complaint fails to state a claim with regard to violations of the Plaintiff's constitutional rights as set out in Counts I through IV, but as will be discussed below, the court is recommending that the Plaintiff be permitted to file an amended complaint. Thus, it is premature at this time to determine whether the Defendants will be entitled to claim a qualified immunity defense.

7.   <u>Whether Plaintiff Should be Given Leave to Amend</u>

The parties' briefs do not discuss whether the Plaintiff should be given leave to file an amended complaint. The court is cognizant that dismissal with leave to amend should be freely given "when justice so requires." Fed. R. Civ. P. 15(a)(2). This policy is liberally applied. *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000). Dismissal without leave to amend is appropriate only when the court determines that the deficiencies in the complaint could not possibly be cured by

amendment. *Id.*

Here, although Plaintiff did not request to file an amended complaint, the court cannot determine as a matter of law on the record before it that none of the Plaintiff's claims would survive if re-plead. The court therefore recommends that the Chief Judge allow the Plaintiff to file an amended complaint as to those counts. With regard to the claim for damages, however, the court recommends that the Chief Judge dismiss with prejudice the Plaintiff's request for money damages against the Defendants in their official capacities, since it is settled law that such damages claims are not permitted under § 1983 and amendment would be futile.

## RECOMMENDATIONS

Based on the above discussion, the below-signed judge recommends that the Chief Judge (1) grant the Motion to Dismiss with regard to Counts 1 through IV of the Complaint but allow the Plaintiff to file an amended complaint to cure the deficiencies discussed above; and (2) grant the Motion to Dismiss the Plaintiff's request for monetary damages against the Defendants in their official capacities without leave to amend.

IT IS SO RECOMMENDED.



/s/ Michael J. Bordallo
U.S. Magistrate Judge
Dated: Jan 21, 2021

**NOTICE**
**Failure to file written objections to this Report and Recommendation within fourteen (14) days from the date of its service shall bar an aggrieved party from attacking such Report and Recommendation before the assigned United States District Judge. 28 U.S.C. § 636(b)(1)(B).**